**MASSACHUSETTS EYE AND EAR INFIRMARY, Plaintiff,**

v.

**QLT PHOTOTHERAPEUTICS, INC., Defendant.**

**QLT Phototherapeutics, Inc., Counter–Claimant**

v.

**Massachusetts Eye and Ear Infirmary, Evangelos S. Gragoudas, M.D., and Joan W. Miller, M.D., Counter–Defendants.**

**No. CIV.A.00–CV10783(RCL).**

United States District Court, D. Massachusetts.

April 13, 2001.

John J. Cotter, Douglas J. Kline, Timothy P. Linkkila, Duncan A. Greenhalgh, Reica B. Abate Recht, Testa, Hurwitz & Thibeault, J. Patrick Kennedy, Testa, Hurwitz & Thibeault, Boston, MA, for Plaintiff.

Donald R. Ware, Barbara A. Fiacco, Foley, Hoag & Eliot, Denise W. DeFranco, Foley, Hoag & Eliot LLP, Boston, MA, Paul G. Cushing, Juliet A. Davidson, Todd & Weld, Thomas F. Maffei, Griesinger, Walsh & Maffei, LLP, Boston, MA, for Defendants.

Lee Carl Bromberg, Bromberg & Sunstein LLP, Boston, MA, for Special Master.

LINDSAY, District Judge.

Report and Recommendation accepted.

### *REPORT AND RECOMMENDATION RE: MEEI'S MOTION FOR PRODUCTION OF DOCUMENTS WITHHELD BY QLT ON THE BASIS OF ATTORNEY–CLIENT PRIVILEGE WITH MORRISON & FOERSTER LLP*

#### MARCH 2, 2001

BROMBERG, Discovery Master.

Massachusetts Eye and Ear Infirmary ("MEEI") has filed a motion for the production of certain documents responsive to MEEI's First Request for Production of Documents and Things By QLT. QLT Phototherapeutics, Inc. ("QLT") has withheld the documents on the basis of an attorney-client privilege between QLT and the law firm of Morrison & Foerster, LLP ("Morrison & Foerster").

#### Background

In a research collaboration spanning several years, scientists from MEEI, Massachusetts General Hospital ("MGH"), and

QLT investigated ophthalmic applications of photodynamic therapy using benzoporphyrin derivative ("BDP"). In March 1994, QLT offered, at QLT's expense, the services of its long-time patent counsel, Dr. Kate H. Murashige of the law firm of Morrison & Foerster, to prepare and prosecute a patent application claiming various ophthalmic applications of photodynamic therapy using BPD. *See* Letter from Barnes to Miller of March 7, 1994 (MEEI Brief at Exs. C and R). Dr. Murashige filed the patent application, Serial No. 08/209,473, on March 14, 1994 (" '473 application").[1] The patent application named Dr. Joan W. Miller of MEEI, Dr. Evangelos S. Gragoudas of MEEI, and Dr. Lucy H.Y. Young of MEEI. as the inventors of the claimed invention.

Following the filing of the '473 application, MGH and QLT disputed the naming of Drs. Miller, Gragoudas, and Young as the inventors of the invention claimed in the '473 application. The dispute centered on the contributions of several other scientists, one from QLT and two from MGH, to the claimed invention. After conferring with MEEI, MGH, and QLT individually on the matter, Dr. Murashige proposed a joint meeting to discuss the issue.

The meeting occurred on December 7, 1994. Some of the attendees at the meeting were Carl S. Finn of MEEI, Drs. Miller and Gragoudas of MEEI, Dr. David J. Glass of MGH, and Dr. Tayyaba Hasan of MGH. In addition, at the meeting, Edmund R. Pitcher of the law firm of Testa, Hurwitz & Thibeault, LLP ("Testa, Hurwitz") represented MEEI and Louis Myers of the law firm of Lahive & Cockfield LLP represented MGH. Dr. Murashige noted that "[a]ttendees from QLT will be Dr. Julia Levy, Dr. Ed Levy and me." Letter from Murashige to Finn of December 1, 1994, at 1 (QLT Opposition Brief at Ex. I).

On December 27, 1994, Dr. Murashige summarized the outcome of the meeting in a letter to Mr. Finn and Dr. Glass, with a copy to Dr. Ed Levy. *See* Letter from Murashige to Finn and Glass of December 27, 1994 (QLT Opposition Brief at Ex. K). The letter proposed filing two continuation-in-part ("CIP") patent applications, with one CIP patent application claiming a liposomal composition of green porphyrins (a generic term for a class of porphyrins that includes BPD). *Id.* at 2. As a result of the new claim limitation, in this CIP patent application Dr. Julia Levy of QLT, Dr. Hasan of MGH, and Dr. Ursula Schmidt–Erfurth of MGH would be named as the inventors of the claimed invention, along with Drs. Miller and Gragoudas of MEEI. *Id.* at 3. Dr. Murashige filed this CIP patent application, Serial No. 08/390,591, on February 17, 1995 (" '591 application").

The second CIP patent application would include additional experimental data relevant to the claims remaining in the '473 application. The second CIP patent application would continue to name Drs. Miller, Gragoudas, and Young of MEEI as the inventors of the claimed invention. *See* Letter from Murashige to Miller of July 26, 1995, at 1 (MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T). Although Dr. Murashige prepared a draft of this CIP patent application, Dr. Murashige never filed the second CIP patent application.

Over the next two years, Dr. Murashige prosecuted the '473 application and

---

1. Dr. Murashige also filed an international application, Serial No. PCT/US94/02639, on March 14, 1994. The international application claimed the same subject matter as the '473 application. *See* Letter from Murashige to Finn of March 13, 1995 (MEEI Brief at Ex. D).

the '591 application before the U.S. Patent and Trademark Office ("PTO"). Dr. Murashige responded to PTO communications, prepared a declaration for Dr. Miller of MEEI in the '473 application, prepared a declaration for Dr. Hasan of MGH in the '591 application, and attended an in-person interview with the PTO Examiner, who was examining both applications, to discuss the '473 and '591 applications. *See generally* MEEI Brief at Ex. D (MEEI's Correspondence with Morrison & Foerster).

In June 1997, the PTO notified Dr. Murashige that the '591 application had been allowed and, upon payment of the issue fee, would issue as a patent. The '591 application issued as a patent, No. 5,798,-349, on August 25, 1998 ("'349 patent"). The '349 patent names Dr. Levy of QLT, Drs. Hasan and Schmidt–Eurfurth of MGH, and Drs. Miller and Gragoudas of MEEI as the inventors of the claimed invention.

In July 1997, the PTO notified Dr. Murashige that the '473 application had been allowed and, upon payment of the issue fee, would issue as a patent. The '473 application issued as a patent, No. 5,707,-986, on January 13, 1998 ("'986 patent"). The '986 patent names Drs. Miller, Gragoudas, and Young of MEEI as the inventors of the claimed invention.

In notifying MEEI, MGH, and QLT of the pending issuance of the '591 application, Dr. Murashige once again brought up the issue of inventorship. In a letter to Shelagh M. Clegg of QLT, copied to Mr. Finn of MEEI, Dr. Glass of MGH, and Dr. Miller of MEEI, Dr. Murashige stated:

> As you know, this brings us to a decision point as to the correct inventorship in this application. In addition to the inventors already named, there appears to be an issue with respect to Dr. Birngruber. In a separate letter, in a week or

so, I will send you my thoughts as a starting point on evaluating inventorship.

Letter from Miller to Clegg of June 16, 1997, at 1 (MEEI Brief at Ex. D). On July 31, 1997, Mr. Pitcher of the law firm of Testa, Hurwitz responded to Dr. Murashige's letter on behalf of MEEI, conveying in the letter MEEI's view on the inventorship of the '591 application. In closing, Mr. Pitcher stated:

> If [MEEI] and QLT cannot come to an agreement on a reasonable royalty rate and other financial terms, we are instructed to assume responsibility for prosecution of patent applications covering subject matter invented without the involvement of Dr. Levy so as to try to preserve MEEI's rights.

Letter from Pitcher to Murashige of July 31, 1997, at 2 (QLT Opposition Brief at Exs. M and Q).

On August 8, 1997, Dr. Murashige sent her promised follow-up letter to Ms. Clegg of QLT, Mr. Finn of MEEI, and Dr. Glass of MGH, with a copy to Dr. David Dolphin of QLT. Dr. Murashige stated:

> I have reviewed the correspondence related to inventorship in this case. I believe the inventors currently listed on the application are proper.

Letter from Murashige to Clegg, Finn, and Glass of August 8, 1997, at 2 (QLT Opposition Brief at Ex. N). Once again, Mr. Pitcher responded to Dr. Murashige's letter on behalf of MEEI, disputing in the letter Dr. Murashige's view on the issue of inventorship. In closing, Mr. Pitcher stated:

> We again request that QLT make a concrete license proposal immediately and/or file a continuation application to permit us to either correct the named inventors, to divide out separately in-

vented subject matter into separate applications, or both.

Letter from Pitcher to Murashige of August 21, 1997, at 2 (QLT Opposition Brief at Ex. R).

On October 2, 1997, MEEI filed a continuation patent application of the '591 application, naming MEEI scientists as the inventors of the claimed invention. *See* Letter of Putukian to Kaufman–Shaw of October 1, 1998, at 1 (QLT Reply Brief at Ex. Y). Nevertheless, over the next several years, MEEI, MGH, and QLT continued to discuss the inventorship of the '591 application, as well as licensing arrangements. *See e.g.*, QLT Opposition Brief at Exs. O, P and S–U; QLT Reply Brief at Exs. Y and Z. By late 1998, MGH and QLT had signed a licensing agreement, whose financial terms were unacceptable to MEEI. *See* Letter from Putukian to Levy of January 6, 1999, at 1 (QLT Reply Brief at Ex. Z). However, MEEI and QLT continued their discussions. *See e.g.*, QLT Opposition Brief at Exs. O, P and S. When the discussions broke down, MEEI filed the complaint that resulted in the present action.

## Discussion

The Federal Rules of Evidence provide that, absent constitutional, statutory, or regulatory authority, a claim of privilege "shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience." Fed.R.Evid. 501. However, for "a claim or defense as to which State law supplies the rule of decision, ... [a claim of] privilege ... shall be determined in accordance with State law." *Id.* In cases in which the claim of privilege applies to evidence relevant to both a federal claim and a state claim, and a conflict exists between the applicable federal law of privilege and the applicable state law of privilege, the Supreme Court has noted "that there is disagreement concerning the proper rule" of decision in those cases. *Jaffee v. Redmond,* 518 U.S. 1, 15 n. 15, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996). *But see* S.Rep. No. 93–1277, at 19 n. 17 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7051, 7069 n. 17 (noting that when conflicting bodies of privilege law apply to the same piece of evidence, "the rule favoring reception of the evidence should be applied").

In the present action, MEEI's complaint raises state law claims (*e.g.,* breach of contract), and QLT's counterclaim raises federal law claims (*e.g.,* correction of inventorship). Moreover, the evidence for which QLT asserts a claim of attorney-client privilege relates to both the state law claims and the federal law claims. *See* MEEI Brief at 2. Thus, in assessing QLT's claim of attorney-client privilege and MEEI's claim of joint attorney-client privilege exception, a review of the applicable federal law for attorney-client privilege, as well as the applicable state law for attorney-client privilege is required.[2]

■ A district court sitting in a diversity case applies the privilege law of the state in which the district court is located. *See e.g., Federal Deposit Ins. Corp. v. Ogden Corp.,* 202 F.3d 454, 460 (1st Cir.2000) (applying Massachusetts law to the issue of attorney-client privilege in a diversity case on appeal from the District Court for the District of Massachusetts). Thus, for the state law claims, the applicable state

---

**2.** MEEI and QLT disagree on whether federal privilege law or state privilege law controls the present privilege issue. MEEI asserts that Massachusetts attorney-client privilege law is controlling, *see* MEEI Supplemental Brief at 2–5, while QLT asserts that federal attorney-client privilege law is controlling, *see* QLT Supplemental Brief at 2–3.

attorney-client privilege law is Massachusetts attorney-client privilege law.

■ A district court sitting in a federal question case generally applies the privilege law of the regional circuit in which the court is located. *See e.g. United States v. Massachusetts Inst. of Tech.,* 129 F.3d 681, 684 (1st Cir.1997) (applying its own privilege law to the issue of attorney-client privilege in a federal question case on appeal from the District Court for the District of Massachusetts). Thus, in general, for the federal law claims, the applicable regional circuit attorney-client privilege law is the attorney-client privilege law of the Court of Appeals for the First Circuit.

However, in at least one circumstance, the Court of Appeals for the Federal Circuit has applied its own privilege law, as opposed to the privilege law of an applicable regional circuit, to an issue of attorney-client privilege that involved communications between patent attorneys and their clients, namely inventors.[3] *See In re Spalding Sports Worldwide,* 203 F.3d 800, 804 (Fed.Cir.2000) (applying Federal Circuit privilege law to the issue of whether an invention record is protected by the attorney-client privilege). The present issue of attorney-client privilege also involves communications between a patent attorney and inventors.

However, the present issue of joint attorney-client privilege also bears similarities to the issue on appeal in another Federal Circuit case, *In re Regents of the*

*University of California,* 101 F.3d 1386 (Fed.Cir.1996).[4] In *Regents,* the Federal Circuit applied regional circuit privilege law to the issue of whether communications between the owner of a patent, the exclusive licensee of the patent, and the exclusive licensee's patent attorney were protected under the joint attorney-client privilege doctrine, as against an accused infringer. *Regents,* 101 F.3d at 1391 n. 2 (applying perceived Seventh Circuit attorney-client privilege law). In *Spalding,* the Federal Circuit distinguished *Regents*'s application of regional circuit privilege law, stating that "any patent involved [in *Regents*] was irrelevant to the question of privilege." *Spalding,* 203 F.3d at 804.

Thus, for the present privilege issue, it is unclear whether the Federal Circuit would follow the reasoning of *Regents* and apply First Circuit privilege law, or follow the reasoning of *Spalding* and apply Federal Circuit privilege law. However, as *Spalding* appears to be the sole Federal Circuit case in which Federal Circuit privilege law is discussed and applied and, for the present privilege issue, that privilege law does not appear to be inconsistent with relevant First Circuit privilege law, it is not necessary to decide the issue of controlling law.

## A. Burdens of Proof

■ In a motion to compel the production of documents withheld on the basis of a privilege, the party asserting the priv-

---

**3.** The Federal Circuit has jurisdiction over an appeal from a final decision of a district court whose jurisdiction is based in whole, or in part, on 28 U.S.C. § 1338. *See* 28 U.S.C. § 1295. QLT's counterclaim asserts jurisdiction, in part, on 28 U.S.C. § 1338.

**4.** QLT argues that the present privilege issue "is quite different from" the privilege issue in *Regents,* because the privilege issue in *Regents* is concerned with the privilege, as against

third parties, and the present privilege issue is concerned with the privilege, as between the clients. QLT Supplemental Brief at 4 n. 2. *See also* QLT February 5, 2001 Letter at 2–3. However, the underlying issues remain the same-whether an attorney-client relationship existed between the lawyer and the putative joint clients for a particular matter and, if so, whether the joint clients shared a common interest in the particular matter.

ilege bears the burden of establishing the privilege. *See Ogden Corp.,* 202 F.3d at 460. Thus, QLT bears the burden of establishing an attorney-client privilege for the withheld documents. In particular, QLT must show that it shared an attorney-client relationship with Morrison & Foerster for the following matters: (1) the preparation and prosecution of the '473 application (which issued as the '986 patent); (2) the preparation and prosecution of the '591 application (which issued as the '349 patent); (3) the licensing of the '986 patent; and (4) the licensing of the '349 patent. In addition, QLT must show that the withheld documents contain confidential communications regarding at least one of these matters.

However, MEEI does not dispute QLT's assertion that QLT shared an attorney-client relationship with Morrison & Foerster for these four matters. In addition, MEEI does not dispute QLT's assertion that the withheld documents contain confidential communications regarding at least one of these matters. Accordingly, QLT has met its burden, for purposes of this motion, of establishing an attorney-client privilege for the withheld documents.

■ Once a privilege has been established, the burden shifts to the proponent to establish an exception to the privilege. *See Ogden Corp.,* 202 F.3d at 460. Thus, MEEI bears the burden of establishing an exception to QLT's asserted attorney-client privilege. In this regard, MEEI asserts the joint attorney-client privilege exception to attorney-client privilege.

## B. Joint Attorney–Client Privilege Exception

■ In Massachusetts, when an attorney represents more than one client in a particular matter, one client's communication made to the attorney in the presence of the other client or clients is not privi-

leged, as between the clients. *See Thompson v. Cashman,* 181 Mass. 36, 62 N.E. 976, 977 (1902) (allowing lawyer who was acting for both plaintiff and defendant to testify to conversation between lawyer, plaintiff, and defendant). Moreover, when an attorney represents more than one client in a particular matter, one client's communication to the attorney outside the presence of the other client or clients is also not privileged, as between the clients. *Holland v. Fisher,* 1994 WL 878780, at *2 (Mass.Super.Dec.21, 1994) (noting that circumstance "goes one step beyond" circumstance in which communication is made in presence of other clients). *See also Catino v. Travelers Ins. Co.,* 136 F.R.D. 534, 537 (D.Mass.1991) (holding that there is no attorney-client privilege for private communications between lawyer and insurance company, as against successor in interest to insurance policy holder, "at least for the period of time when" lawyer represented both insurance company and insurance policy holder).

The First Circuit has discussed the joint attorney-client privilege exception in two cases, *Massachusetts Inst. of Tech.* and *Ogden Corp.,* In *Massachusetts Inst. of Tech.,* the First Circuit considered the exception in response to MIT's argument that MIT and the Defense Contract Audit Agency shared a common interest in the proper performance of MIT's defense contracts. *Massachusetts Inst. of Tech.,* 129 F.3d at 685–686. The First Circuit held that such an interest was "not the kind of common interest" needed to invoke the exception. *Id.* However, in *Massachusetts Inst. of Tech.,* the First Circuit's discussion on the joint attorney-client privilege exception was limited.

In contrast, in *Ogden Corp.,* the First Circuit's discussion on the exception was extensive. In *Ogden Corp.,* the First Circuit held that Ogden and the plaintiff

shared a common interest (a litigation action against an insurer) and, as a result, Ogden's communications with the attorney representing Ogden and the plaintiff in the litigation action were not privileged, as between Ogden and the plaintiff. *Ogden Corp.*, 202 F.3d at 462–64. However, in *Ogden Corp.*, the First Circuit ostensibly applied Massachusetts privilege law. *Id.* at 460 ("We look to Massachusetts law to determine the scope of both the asserted privilege and the exception in this case."). In fact, the First Circuit relied on several learned treatises, as well as persuasive case law from various regional circuits and district courts, including the Court of Appeals for the District of Columbia, the District Court for the Northern District of California, and the District Court for the Southern District of New York. In turn, these cases relied on learned treatises, relevant state privilege law, and relevant regional circuit privilege law. Thus, the First Circuit's decision in *Ogden Corp.* is instructive on "the principles of the common law as they may be interpreted by the courts of the United States in light of reason and experience" on the present privilege issue. Fed.R.Evid. 501.

Supreme Court Standard 503 is also instructive on the common-law principles for the joint attorney-client privilege exception.[5] The Standard, which discusses the attorney-client privilege, states:

There is no privilege under this [standard] ... as to a communication relevant to a matter of common interest between two or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between any of the clients.

Sup.Ct. Standard 503(d)(5), *reprinted in Weinstein's Evidence*, § 503.01.[6]

The Federal Circuit has not discussed the joint attorney-client privilege law in a case in which the Federal Circuit applied its own privilege law. *Cf. Regents*, 101 F.3d at 1391 n. 2 (applying perceived Seventh Circuit joint attorney-client privilege law).

### 1. Attorney–Client Relationship

██ The attorney-client privilege and, therefore, the joint attorney-client privilege exception, "springs from the attorney-client relationship." *Ogden Corp.*, 202 F.3d at 461. Thus, in order to meet its burden of establishing a joint attorney-client privilege exception to QLT's asserted attorney-client privilege, MEEI must first establish that MEEI shared an attorney-client relationship with Morrison & Foerster on the following matters: (1) the preparation and prosecution of the '473 application (which issued as the '986 patent); (2) the preparation and prosecution of the '591 application (which issued as

---

**5.** The Supreme Court proposed the Standards as Rules of Evidence, but Congress did not enact the Standards when it enacted the Federal Rules of Evidence. *See* Jack B. Weinstein et al., *Weinstein's Federal Evidence* § 503.02 (2d ed.2000) (hereinafter *"Weinstein's Evidence"*). A number of regional circuit courts, however, have relied on Sup.Ct. Standard 503 as a guide to federal attorney-client privilege law. *See e.g., In re Grand Jury Subpoena Served Upon Doe*, 759 F.2d 968, 982 (2d Cir.1985); *United States v. Moscony*, 927 F.2d 742, 751 (3d Cir.1991); *United States v. (Under Seal)*, 748 F.2d 871, 874, 874 n. 5, 874

n. 6 (4th Cir.1984); *Linde Thomson Langworthy Kohn & Van Dyke, P.C. v. Resolution Trust Corp.*, 5 F.3d 1508, 1514 (C.A.D.C.1993); *In re Bieter Co.*, 16 F.3d 929, 935 (8th Cir.1994).

**6.** The source of the "joint client" rule may be based on the assumption that a "court will not allow [an] attorney to protect the interest of one client by refusing to disclose information received from that client to the detriment of another client." *Valente v. Pepsico, Inc.*, 68 F.R.D. 361, 368 (D.Del.1975).

the '349 patent); (3) the licensing of the '986 patent; and (4) the licensing of the '349 patent. In Massachusetts, an attorney-client relationship develops

> when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advice or assistance.

*DeVaux v. American Home Assur. Co.*, 387 Mass. 814, 444 N.E.2d 355, 357 (Mass. 1983). *See also Ogden Corp.*, 202 F.3d at 461 (quoting *DeVaux* ).

■ While the First Circuit has not enunciated a specific rule for when an attorney-client relationship develops, the First Circuit has stated that a communication is protected from disclosure pursuant to an attorney-client privilege when

> (1) legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.

*Massachusetts Inst. of Tech.*, 129 F.3d at 684 (quoting 8 John H. Wigmore, *Wigmore on Evidence*, § 2292, at 554 (McNaughton rev. ed.1961)). As the First Circuit stated, the attorney-client privilege "springs from the attorney-client relationship." *Ogden Corp.*, 202 F.3d at 461. "Courts customarily determine the existence *vel non* of an attorney-client relationship by evaluating whether the putative client's belief that such a relationship existed was objectively reasonable under all the circumstances." *Id.* at 463.

The First Circuit's holdings mirror Supreme Court Standard 503, which defines a client as "a person ... or corporation ... who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him." Sup.Ct. Standard 503(a)(1), *reprinted in Weinstein's Evidence*, § 503.01. Standard 503 defines a lawyer as "a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation." Sup.Ct. Standard 503(a)(2), *reprinted in Weinstein's Evidence*, § 503.01. In addition, Standard 503 defines a confidential communication as a communication that is "not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client." Sup.Ct. Standard 503(a)(3), *reprinted in Weinstein's Evidence*, § 503.01.

In regard to Federal Circuit privilege law, the Federal Circuit has stated that "it is not necessary to expressly request confidential legal assistance when that request is implied." *Spalding*, 203 F.3d at 806. Rather, "[i]t is enough that the overall tenor of the document indicates that it is a request for legal advice or services." *Id.* The document at issue in *Spalding* was an invention record, a document containing "such information as names of inventors, description and scope of invention, closest prior art, first date of conception and disclosure to others, dates of publication, etc." *Id.* at 802 n. 2. The Federal Circuit found that such a document was "prepared and submitted primarily for the purpose of obtaining legal advice on patentability and legal services in preparing a patent application." *Id.* at 806. Thus, the Federal Circuit held that the invention record was a privileged attorney-client communication. *Id.* (rejecting rationale that a patent attorney is a mere conduit to the PTO).

#### a. '473 Application

■ MEEI has met its burden of establishing that MEEI shared an attorney-

client relationship with Morrison & Foerster on the preparation and prosecution of the '473 application. MEEI initiated the relationship when, on March 3, 1994, MEEI sent Dr. Murashige a communication marked "Confidential." Letter from Miller to Murashige of March 3, 1994, at 1 (MEEI Brief at Ex. D; MEEI February 16, 2001 Letter at Ex. V). The letter discussed "Ophthalmic Applications of Photodynamic Therapy (PDT)" (hereinafter "the project"), the date of the first publication of the project, "novel" aspects of the project, the names of persons involved in the project, a description of the project, and prior art relevant to the project. *Id.* at 2–3 and Attachments. In addition, the letter noted: "A patent for PDT using BPD in ocular indications could include neovascularization and tumors." *Id.* at 2.

As the Federal Circuit stated in *Spalding,* "it is not necessary to expressly request confidential legal assistance when that request is implied." *Spalding,* 203 F.3d at 806. A request for confidential legal assistance is implicit in MEEI's March 3, 1994, letter to Dr. Murashige. The letter, addressed to a patent attorney, discusses a patent matter. It is marked "Confidential." It contains confidential information, such as a detailed description of the project and "novel" aspects of the project. Moreover, the letter makes suggestions for patent coverage for the project. Thus, like the invention record in *Spalding,* the letter was "prepared and submitted primarily for the purpose of obtaining legal advice on patentability and legal services in preparing a patent application." *Id.*

In turn, MEEI received that legal advice and legal service from Dr. Murashige, a lawyer competent to render such legal advice and legal services. For example, on March 8, 1994, Dr. Murashige sent MEEI a reply letter, confirming that QLT would support the preparation of a patent application for the project and that Morrison & Foerster would prepare the patent application. Letter from Murashige to Finn of March 8, 1994, at 1 (MEEI Reply Brief at Ex. S; QLT Opposition Brief at Ex. A). While Dr. Murashige offered to send "drafts" of the patent application to "patent counsel for MEEI," the record shows MEEI never accepted her offer, nor did she ever send such drafts to "patent counsel for MEEI." *Id.* at 1. Moreover, Dr. Murashige noted that she needed to discuss inventorship with MEEI (a legal issue), but she believed MEEI would be the sole assignee of the patent application (another legal issue). *Id.* Then, in conclusion, Dr. Murashige wrote: "Thank you for the opportunity to prepare this application." *Id.* at 2.

In response, on March 9, 1994, MEEI sent Dr. Murashige additional prior art information, as well as a copy of the March 15, 1993, abstract which disclosed the project to the public. Letter from Miller to Murashige of March 9, 1994 (MEEI Brief at Ex. D; MEEI February 16, 2001 Letter at Ex. V). On March 10, 1994, Dr. Murashige sent MEEI a draft patent application to review, asking MEEI to let her know "whether there are changes you would like made in the claims." Letter from Murashige to Miller of March 10, 1994 (MEEI Brief at Ex. D; MEEI February 16, 2001 Letter at Ex. V). After exchanging several more drafts of the patent application with MEEI, on March 14, 1994, Dr. Murashige filed the patent application (the '473 application) with the PTO. A few weeks later, the MEEI inventors named in the '473 application gave Dr. Murashige a power of attorney to act on their behalf in the PTO in regard to the '473 application. *See* MEEI Brief at Ex. F.

QLT argues that "Dr. Murashige made clear her understanding that MEEI was independently represented by its own patent counsel." QLT Opposition Brief at 12; QLT Reply Brief at 7. In support of this argument, QLT points to Dr. Murashige's March 8, 1994, letter to Mr. Finn, in which she offers to send "drafts" of the '473 application to "patent counsel for MEEI." *Id.* However, as discussed above, MEEI did not accept Dr. Murashige's offer and Dr. Murashige never sent "drafts" to "patent counsel for MEEI." Thus, while Dr. Murashige's statement may raise a question about who she believed was her client, MEEI sought Dr. Murashige's legal advice on a patent matter and Dr. Murashige gave MEEI legal advice about the patent matter. *See Regents,* 101 F.3d at 1390 (stating that the issue is not who a lawyer believes is his or her client, but whether a lawyer is "acting in a professional relationship with a person"). In addition, because a party seeks legal advice from Lawyer B, does not preclude the party from having an on-going attorney-client relationship with Lawyer A.

QLT also argues that, as of October 7, 1994, MEEI was represented by Mr. Pitcher of the law firm of Testa, Hurwitz. QLT Opposition Brief at 12. In support of this argument, QLT points to various communications from MEEI in which MEEI referred to Morrison & Foerster as "QLT's patent counsel." QLT Reply Brief at 5–6. The first communication, sent October 1, 1998, notes that the '473 patent application "was filed on behalf of MEEI by QLT's patent counsel." Letter from Putukian to Kaufman–Shaw of October 1, 1998, at 1 (QLT Reply Brief at Ex. Y). QLT emphasizes the significance of the last portion of the statement-"by QLT's patent counsel." But, the first portion of the statement is just as significant-"on behalf of MEEI." The second communication, sent January 6, 1999, once again

notes that the '473 application "was filed on behalf of [MEEI] by QLT's patent counsel." Letter from Putukian to Levy of January 6, 1999, at 1 (QLT Reply Brief at Ex. Z). The letter also states: "A brief conversation did take place on Monday, December 21, 1998 with Dr. Kate Murashige of Morrison & Foerster, but with such short notice, legal. counsel representing [MEEI] was not able to participate." *Id.* at 2. However, that "brief conversation" regarded the licensing of the '986 and/ or '349 patents, not the preparation and prosecution of the '473 application.

In addition, QLT notes that Mr. Pitcher represented MEEI at the December 7, 1994, meeting between MEEI, MGH, and QLT to discuss inventorship issues, and that MEEI consulted Mr. Pitcher regarding a matter in the preparation and prosecution of the '591 application. *Id.* at 6. However, MEEI's attorney-client relationship with Mr. Pitcher did not, *a priori,* terminate MEEI's attorney-client relationship with Dr. Murashige on the preparation and prosecution of the '473 application. *See* 37 C.F.R. § 10.40 (stating that a patent "practitioner shall not withdraw from employment until the practitioner has taken reasonable steps to avoid foreseeable prejudice to the rights of the client, including giving due notice to his or her client"). Moreover, after the December 7, 1994, meeting, Dr. Murashige continued to communicate with MEEI, as opposed to Mr. Pitcher, on the prosecution of the '473 application. These communications included legal advice.

For example, on December 27, 1994, Dr. Murashige sent a letter to MEEI that summarized "the results" of that December 7, 1994, meeting. Letter from Murashige to Finn and Glass of December 27, 1994 (QLT Opposition Brief at Ex. K). The letter discussed the inventorship of the '473 application (a legal issue), pro-

posed claims for a new patent application (a legal issue) in which MEEI would be a co-owner, discussed the inventorship of the proposed claims (a legal issue), and solicited MEEI's comments. *Id.*

Further, over the next few years, Dr. Murashige continued to provide MEEI with legal advice on the '473 application. For example, on August 17, 1995, Dr. Murashige sent MEEI a letter discussing a first PTO communication rejecting claims in the '473 application. Letter from Murashige to Dolphin and Finn of August 17, 1995 (MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T). In the letter, Dr. Murashige proposed specific amendments to the claims in the '473 application (a legal issue) to overcome the rejection. Dr. Miller filed the proposed amendment in the PTO on September 28, 1995.

On August 2, 1996, Dr. Murashige sent MEEI another letter discussing a second PTO communication rejecting claims in the '473 application. Letter from Murashige to Miller of August 2, 1996 (MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T). In the letter, Dr. Murashige proposed filing a declaration in the PTO (a legal issue) to overcome the rejection, and offered to prepare such a declaration (a legal issue) for Dr. Miller's review and signature. *Id.* Dr. Miller filed the amendment and declaration in the PTO on August 6, 1996. Dr. Murashige also filed a second declaration, as well as a third amendment, in the PTO for the '473 application. This filing was in response to a third PTO communication rejecting claims in the '473 application. Dr. Murashige prepared the second declaration (a legal issue). Letter from Murashige to Miller of July 3, 1997 (MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T).

QLT attempts to portray Dr. Murashige's relationship with MEEI as "technical in nature." QLT Reply Brief at 3. In support of this portrayal, QLT relies on a Federal Circuit case, *Sun Studs, Inc. v. Applied Theory Assoc.*, 772 F.2d 1557 (Fed.Cir.1985). In that case, the Federal Circuit held that an inventor under an obligation to assign his or her rights in a patent application to a particular company does not *ipso facto* develop an attorney-client relationship with the company's patent counsel, who prepares and prosecutes the patent application, even though the inventor gave the company's patent counsel the power of attorney to act on his or her behalf in the PTO. *Sun Studs*, 772 F.2d at 1567–70. In support of the holding, the Federal Circuit noted that the inventor's obligation to assign his or her patent rights to a company includes an obligation to assist the company in obtaining those patent rights, and the inventor's power of attorney to the company's patent counsel is given on behalf of the company, not the inventor. *Id.* at 1569.

The present circumstances are readily distinguishable. In *Sun Studs*, the patent attorney was working on behalf of the company to whom the inventor was obliged to assign his or her patent rights. Here, from QLT's perspective, Dr. Murashige was working on behalf of QLT. The inventors named in the '473 application were not obliged to assign their patent rights in the '473 application to QLT. If the inventors named in the '473 application were obliged to assign their patent rights to a company and give their power of attorney to Dr. Murashige on behalf of that company, that company was MEEI, not QLT.

QLT also relies on a District Court for the Northern District of Illinois case to support its portrayal of Dr. Murashige's relationship with MEEI as "technical in nature." QLT Reply Brief at 4. In that case, the district court stated that the communication of "technical information to an attorney primarily to enable the attorney

to prepare a patent application does not in itself call for the attorney to render any legal advice." *Pain Prevention Lab v. Electronic Waveform Labs,* 657 F.Supp. 1486, 1497 (N.D.Ill.1987). In *Spalding,* the Federal Circuit stated that "requests for legal advice on patentability or for legal services in preparing a patent application necessarily require the evaluation of technical information." *Spalding,* 203 F.3d at 806. Moreover, contrary to QLT's assertion, MEEI's March 3, 1994, letter to Dr. Murashige did not consist of "transmissions of technical information." QLT February 16, 2001 Letter at 2. While it is correct that MEEI's letter was not an invention record *per se,* MEEI's letter included confidential information similar to the types of confidential information found in an invention record, such as date of disclosure, name of inventors, and "novel" aspects of the subject matter.

QLT further argues that the fact that MEEI did not send Dr. Murashige the "official" MEEI invention record is "telling" of MEEI's view of its relationship with Dr. Murashige. QLT Supplemental Brief at 8. This argument seems to imply that MEEI, not viewing Dr. Murashige as its patent attorney, sought to keep the information in the invention record confidential. But MEEI had already provided Dr. Murashige with most, if not all, of the relevant confidential information in the invention record. *See* QLT Supplemental Brief at Ex. EE. Thus, most likely, MEEI simply never thought to send Dr. Murashige the invention record. After all, not only had MEEI already provided Dr. Murashige with the relevant information, Dr. Murashige had already filed the '473 patent application.

Accordingly, in light of all the circumstances, MEEI's belief that MEEI shared an attorney-client relationship with Morrison & Foerster for the preparation and prosecution of the '473 application was objectively reasonable.

### b. '591 Application

The '591 application is related to the '473 application. In particular, the '591 application is a CIP patent application of the '473 application. Moreover, except for one claim limitation, the subject matter claimed in the '591 application is "substantially the same" as the subject matter claimed in original claim 1 in the '473 application. Letter from Murashige to Finn and Glass of December 27, 1994, at 2 (QLT Opposition Brief at Ex. K). The same patent attorney, Dr. Murashige, prepared and prosecuted the '473 application and the '591 application. In addition, in preparing the '591 application, Dr. Murashige used confidential information she received from MEEI while preparing the '473 application, most particularly, MEEI's March 3, 1994, letter. *Cf. Kevlik v. Goldstein,* 724 F.2d 844, 850–51 (1st Cir.1984) (holding that in a civil action a lawyer may not represent a present client against a former client when the lawyer receives confidential information from the former client that is relevant to the present client's cause of action).

MEEI does not distinguish between Morrison & Foerster's representation of MEEI in the '473 application and Morrison & Foerster's representation of MEEI in the '591 application. For example, MEEI supports its argument that Dr. Murashige provided legal advice to MEEI in regard to the '473 and '591 applications with a specific discussion of various letters from Dr. Murashige to MEEI. MEEI Reply Brief at 6–7. However, in these letters, Dr. Murashige provided MEEI legal advice related to the '473 application, not the '591 application. Thus, it could be argued that MEEI has not met its burden of establishing that MEEI shared an attor-

ney-client relationship with Morrison & Foerster on the preparation and prosecution of the '591 application.

However, QLT also does not distinguish between the '473 and the '591 applications in its arguments. For example, QLT argues that Morrison & Foerster did not share an attorney-client relationship with MEEI in both the '473 application and the '591 application because MEEI did not give Dr. Murashige the invention record for the '473 patent application. QLT Supplemental Brief at 8; QLT February 16, 2001 Letter. Or, QLT argues that Morrison & Foerster did not share an attorney-client relationship with MEEI in both the '473 application and the '591 application because MEEI's March 3, 1994, letter to Dr. Murashige "consists of transmissions of technical information." QLT February 16, 2001 Letter. Thus, MEEI and QLT connect the attorney-client relationship issue in the '591 application with the attorney-client relationship issue in the '473 application.

From the record, it appears that Dr. Murashige kept MEEI informed on the status of the '591 application, sending MEEI copies of communications between Dr. Murashige and the PTO. *See generally*, MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T. However, Dr. Murashige did not send MEEI letters similar to the letters, discussed above, she sent MEEI in the '473 application. For example, the record does not show MEEI received a letter proposing an amendment in response to a PTO communication rejecting claims in the '591 application. Yet, it is clear from the record that the PTO did reject claims in the '591 application.

Dr. Murashige prosecuted the '473 application and the '591 application in parallel. For example, on August 1, 1996, Dr. Mu-

rashige filed an amendment in the PTO for the '591 application. *See* Letter from Soll to Clegg with a copy to Glass and Finn of August 7, 1996 (MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T). Less than a week later, on August 6, 1996, Dr. Murashige filed an amendment in the PTO for the '473 application. *See* Letter from Soll to Finn of August 7, 1996 (MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T). In addition, in April of 1997, Dr. Murashige attended an in-person interview with the PTO Examiner, who was examining both applications, to discuss the '473 application and the '591 application. *See* Letter from Murashige to Clegg with a copy to Dolphin, Finn, and Glass of April 10, 1997 (MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T). On August 12, 1997, Dr. Murashige paid the issue fee for the '591 application. *See* Letter from Robins to Clegg with a copy to Finn and Miller of August 13, 1997 (MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T). Less than six weeks later, Dr. Murashige paid the issue fee for the '473 application. *See* Letter from Robins to Clegg with a copy to Finn and Miller of September 24, 1997 (MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T).

In the interim, Dr. Murashige was preparing another patent application for MEEI-a CIP patent application that would include additional experimental data relevant to the claims remaining in the '473 application.[7] The second CIP patent application would continue to name Drs. Miller, Gragoudas, and Young of MEEI as the inventors of the claimed invention. *See* Letter from Murashige to Miller of July 26, 1995, at 1 (MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T). Dr. Murashige sent MEEI at least one "draft" of this CIP patent application. Letter from Murashige to Miller of February 1, 1995

7. This CIP patent application was not filed in the PTO.

(MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T). In addition, Dr. Murashige sent MEEI several letters regarding the CIP patent application. For example, on June 8, 1995, Dr. Murashige sent MEEI a letter in which she stated: "I am just writing a cover letter to you to find out whether, in the event QLT does not wish to support a continuation-in-part, MEEI would like to do so." Letter from Murashige to Finn with a copy to Dolphin of June 8, 1995 (MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T). With the letter, Dr. Murashige enclosed a letter she sent to Dr. Miller of MEEI. In the letter to Dr. Miller, Dr. Murashige stated: "As you know, it is my view that although there is adequate basis in the originally filed application to support claims, it would probably be easier to prosecute them in the continuation-in-part which contains experimental data." Letter from Murashige to Miller with a copy to Dolphin and Finn of June 8, 1995 (MEEI Brief at Ex. D; MEEI Reply Brief at Ex. T).

Thus, in light of the close relationship between the '591 application and the '473 application, as well as Dr. Murashige's representation of MEEI on the '473 application and the second CIP patent application during the preparation and prosecution of the '591 application, MEEI's belief that MEEI shared an attorney-client relationship with Morrison & Foerster on the preparation and prosecution of the '591 application was objectively reasonable. Accordingly, MEEI has met its burden of establishing that MEEI shared an attorney-client relationship with Morrison & Foerster on the preparation and prosecution of the '591 application.

### c. Licensing

 MEEI has not met its burden of establishing that MEEI shared an attorney-client relationship with Morrison &

Foerster on the licensing of the '986 patent or on the licensing of the '349 patent. In particular, MEEI has not provided any evidence that MEEI sought Morrison & Foerster's legal advice on the licensing matters.

MEEI states that Dr. Murashige assured MEEI that QLT would treat MEEI fairly and compensate MEEI for its intellectual property through a license agreement. MEEI Brief at 7. MEEI states that it relied on these "assurances" to continue its collaboration with QLT. *Id.* at 7–8. However, Dr. Murashige's statements were not legal advice. Moreover, MEEI has not shown that Dr. Murashige's statements were given in response to MEEI's request for legal advice on the licensing matters.

In addition, MEEI received several communications from QLT, as opposed to Morrison & Foerster, that MEEI could have relied upon to continue its collaboration with QLT. For example, on December 15, 1995, QLT sent MEEI a letter regarding a "business agreement" for the '591 application. Letter from Dolphin to Finn of December 15, 1995 (MEEI Brief at Ex. H). The letter stated: "Consequently, QLT does intend to negotiate in good faith with the MEEI/MGH and other assignees to come to an agreement on reasonable terms and royalty rates which will be consistent with industry standards under similar circumstances." *Id.* On September 6, 1996, QLT sent MEEI another letter regarding a license agreement-for the subject matter claimed in the '473 application and corresponding PCT application. Letter from Dolphin to Finn of September 6, 1996 (MEEI Brief at Ex. H). This letter, summarizing a telephone conversation between Dr. Dolphin of QLT and Mr. Finn of MEEI, memorialized MEEI's and QLT's understanding in regard to the legal costs for the patent applications and an exclu-

sive license for the subject matter claimed in the patent applications. *Id.*

Moreover, the evidence supports an inference that MEEI had an attorney-client relationship with Testa, Hurwitz on the licensing of the '986 and '349 patents. For example, in an April 12, 1995, letter, Dr. Murashige wrote:

> I spoke with Ted Pitcher the other day, as you undoubtedly know, and I understand that MEEI will be cooperating with QLT again vis-à-vis the use of BPD in ocular indications.
>
> That being the case, I want to remind you that on February 1, 1995, I forwarded to Joan Miller a proposed continuation-in-part having to do with the angiography aspects of the invention on which we originally filed.

Letter from Murashige to Finn with a copy to Dolphin of April 12, 1995, at 1 (MEEI Reply Brief at Ex. T; Production No. Q08556–57). On June 8, 1995, Mr. Pitcher sent a letter to MEEI in response to an MEEI request for legal advice on the inventorship of the '591 application. Letter from Pitcher to Finn with a copy to Murashige of June 8, 1995 (QLT Opposition Brief at Ex. L). In that letter, Mr. Pitcher stated:

> While we remain prepared to file an application (or prosecute the original) limiting the subject matter to inventions clearly conceived and reduced to practice by Drs. Miller and Gragoudas, any such patent will have limited value unless MEEI succeeds in negotiating a license agreement with QLT.

*Id.* at 2. Once again, on July 31, 1997, Mr. Pitcher sent a letter, this time to Dr. Murashige, regarding MEEI's concerns about the inventorship of the '591 application and the licensing of the '986 and/or '349 patent. Letter from Pitcher to Murashige with a copy to Finn and Dolphin of July 31, 1997 (QLT Opposition Brief at Exs. M and Q). In that letter, Mr. Pitcher stated:

> If [MEEI] and QLT cannot come to agreement on a reasonable royalty rate and other financial terms, we are instructed to assume responsibility for prosecution of patent applications covering subject matter invented without the involvement of Dr. Levy so as to try to preserve MEEI's rights.

*Id.* at 2. On August 21, 1997, Mr. Pitcher followed up this letter with another letter to Dr. Murashige. Letter from Pitcher to Murashige with a copy to Finn of August 21, 1997 (QLT Opposition Brief at Ex. R). In that letter, Mr. Pitcher stated:

> We again request that QLT make a concrete license proposal immediately and/or file a continuation application to permit us to either correct the named inventors, to divide out separately invented subject matter into separate applications, or both.

*Id.* at 2.

Accordingly, in light of all the circumstances, MEEI's belief that MEEI shared an attorney-client relationship with Morrison & Foerster on the licensing of the '986 patent and on the licensing of the '349 patent was not objectively reasonable.

### 2. Common Interest

The joint attorney-client privilege exception "presupposes" that the clients communicated with the attorney on a matter of common interest. *Ogden Corp.,* 202 F.3d at 461. The phrase "common interest" requires that the nature of the interest be legal, and that the legal interest be the same, or nearly the same, legal interest. *See id.* (citing to state privilege law cases); *Regents,* 101 F.3d at 1390 (applying Seventh Circuit privilege law). Thus, MEEI must establish that MEEI and QLT shared a "common interest" in the preparation and prosecution of the '473 application and the preparation and prosecution of the '591 application.

### a. '473 Application

MEEI has met its burden of establishing that MEEI and QLT shared a common legal interest in the preparation and prosecution of the '473 application. As noted above, MEEI and QLT had an arrangement in which QLT would pay the costs of preparing and prosecuting the '473 application, as well as the national patent applications resulting from the corresponding PCT application, in exchange for MEEI's grant of an exclusive license to QLT for the subject matter claimed in those same patent applications. *See* Letter from Dolphin to Finn of September 6, 1996 (MEEI Brief at Ex. H). While MEEI and QLT never successfully negotiated such an exclusive license, that fact does not detract from the fact that, at least until those negotiations finally broke down, MEEI and QLT shared a common legal interest in obtaining a strong and enforceable patent on the subject matter claimed in the '473 application.

QLT argues that MEEI and QLT did not share a common interest in the '473 application because MEEI and QLT disagreed over the inventorship of the '473 application. *See* QLT Opposition Brief at 12–13; QLT Reply Brief at 8–9. However, despite the inventorship disagreement, QLT continued to pay the legal costs of prosecuting the '473 application, and QLT continued to express an interest in receiving an exclusive license from MEEI for the subject matter claimed in the '473 application. In addition, Dr. Murashige advised MEEI and QLT "that there is always an obligation to correct inventorship as the claimed subject matter changes and we will need to revisit this issue again, perhaps, when allowed claims are obtained." Letter from Murashige to Finn and Glass of December 27, 1994, at 3 (QLT Opposition Brief at Ex. K). Moreover, in the '473 application, the PTO determined that, as filed, the '473 application claimed three distinct inventions. Thus, the PTO required MEEI to chose one of those inventions for prosecution in the '473 application. The invention MEEI "chose" involved an aspect of MEEI's and QLT's collaboration on which there was no dispute regarding inventorship. Thus, MEEI's and QLT's dispute over inventorship related to the '591 application, not the '473 application.

Accordingly, MEEI and QLT shared a common legal interest in the preparation and prosecution of the '473 application, namely a strong and valid patent with which QLT could support its commercial activities and MEEI could support its royalty income. *See Regents,* 101 F.3d at 1390 (holding that company with an option for an exclusive license in the subject matter of a patent application shared a common legal interest with the patent application's assignee in the preparation and prosecution of the patent application).

### b. '591 Application

MEEI has also met its burden of establishing that MEEI and QLT shared a common legal interest in the preparation and prosecution of the '591 application. The '591 application named five inventors. One of those inventors assigned her patent rights in the '591 application to QLT. Thus, QLT would become a co-owner of the resultant patent, namely the '349 patent. As a co-owner of the '349 patent, QLT would have the "presumption of ownership in the entire patent." *Ethicon. Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1466 (Fed.Cir. 1998). Accordingly, QLT would have the "power to license rights in the entire patent." *Id.*

In the same manner, two of the other named inventors in the '591 application assigned their patent rights to MEEI. Thus, like QLT, MEEI was a co-owner of the '349 patent. As a co-owner, MEEI would also have the "power to license

rights in the entire patent." *Id.* Thus, MEEI and QLT shared a common legal interest in the preparation and prosecution of the '591 application, namely a strong and valid patent with which QLT could support its commercial activities and MEEI could support its royalty income.

**C. Termination of Common Interest**

■ Where a joint attorney-client relationship does exist, the relationship "remains intact until it is expressly terminated." *Ogden Corp.,* 202 F.3d at 463. In the alternative, the joint attorney-client relationship may terminate when circumstances "readily imply" to the joint clients that the relationship is over. *Id.* There is no evidence in the record that MEEI's and QLT's joint attorney-client relationship with Morrison & Foerster for the preparation and prosecution of the '473 application, or for the preparation and prosecution of the '591 application, was expressly terminated.

However, in a letter dated October 1, 1998, MEEI informed QLT that MEEI had filed in the PTO a continuation patent application of the '591 application. From the record, it is clear that neither QLT nor Morrison & Foerster was involved in the preparation or prosecution of the continuation patent application. Thus, on the evidence before me, at least as of October 1, 1998, both MEEI and QLT understood that their respective legal interests in the '349 patent were no longer the same, or nearly the same, legal interest. *See Ogden Corp.,* 202 F.3d at 463 (holding joint attorney-client relationship terminates when *"all the joint clients"* are aware of the explicit or implicit termination) (emphasis in original). With the continuation patent application, MEEI could seek to have the PTO determine, in an interference proceeding against MGH and QLT, who first conceived and reduced to practice the subject matter claimed in the '349 patent. *See e.g.* Letter from Pitcher to

Murashige of March 11, 1999, at 1 (QLT Opposition Brief at Ex. P).

It is less clear when MEEI's and QLT's respective legal interests in the '986 patent were no longer the same, or nearly the same, legal interest. In particular, it is unclear from the record when both MEEI and QLT understood that QLT would not become the exclusive licensee of the '986 patent. However, the '473 application is the parent application of the '591 application. Thus, the '473 application, and thus the '986 patent, might be critical to proving dates of conception and reduction to practice in an interference proceeding between MEEI, MGH, and QLT on the subject matter claimed in the continuation patent application. In other words, in such a proceeding, both MEEI and QLT would seek to establish primacy of their patent rights vis-à-vis the other party's patent rights. Accordingly, on the evidence before me, at least as of October 1, 1998, both MEEI and QLT understood that their respective legal interests in the '986 patent were no longer the same, or nearly the same, legal interest.

**D. Estoppel**

QLT argues that MEEI is estopped from asserting the joint attorney-client privilege exception. QLT Opposition Brief at 15–17. In support of its argument, QLT argues that MEEI "acquiesced for six years in Morrison & Foerster serving as counsel exclusively to QLT vis-à-vis MEEI on the very issue alleged to be the subject of the common interest." *Id.* at 15. In addition, QLT argues that "MEEI was under an equitable duty to inform QLT" of MEEI's belief that MEEI shared an attorney-client relationship with Morrison & Foerster on the preparation and prosecution of the '473 application and the '591 application, as well as MEEI's belief that MEEI and QLT shared a common interest on those same matters. *Id.* at 16.

 The party asserting equitable estoppel bears the burden of proving the component elements of equitable estoppel. *Clauson v. Smith*, 823 F.2d 660, 663 (1st Cir.1987). There are four components elements to a classic equitable estoppel:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*Id.* at 662 (quoting *Hampton v. Paramount Pictures*, 279 F.2d 100, 104 (9th Cir.)). Thus, QLT must show that, in regard to the preparation and prosecution of the '473 and '591 applications: (1) MEEI knew MEEI shared an attorney-client relationship with Morrison & Foerster; (2) MEEI acted as if MEEI did not share an attorney-client relationship with Morrison & Foerster; (3) QLT did not know MEEI shared an attorney-client relationship with Morrison & Foerster; and (4) QLT relied on MEEI's conduct to QLT's detriment.

However, in matters requiring a legal determination, such as the existence *vel non* of an attorney-client relationship, a lawyer is better qualified than a lay person to make the requisite determination. In particular, when an attorney represents two or more clients on a particular matter, the lawyer

may have an ethical obligation to [the] clients to suggest, at the outset, the

possibility of loss of the privilege in a subsequent falling out, giving either or both of the joint clients an opportunity to obtain independent representation or take the risk of possible disclosure.

*Weinstein's Evidence*, § 503.21. Thus, even if QLT could meet its burden of proof on the first three component elements, QLT could not meet its burden of proof on the fourth component element.[8] Accordingly, QLT's argument that MEEI is estopped from asserting the joint attorney-client privilege exception is without merit.

### Conclusion

In accordance with the foregoing decision, I recommend that MEEI's motion be allowed-in-part and denied-in-part and that QLT be ordered to produce the following documents:[9]

— all documents between QLT and Morrison & Foerster relating to the patentability of the '473 application and the '591 application from March 3, 1994 to September 30, 1998;

-all documents between QLT and Morrison & Foerster relating to the inventorship of the '473 application and the '591 application from March 3, 1994 to September 30, 1998;

-all documents between QLT and Morrison & Foerster relating to the actual or potential preparation or prosecution of U.S. or foreign patent applications related to the subject matter of the '473 application and the '591 application from March 3, 1994 to September 30, 1998; and

-all other documents between QLT and Morrison & Foerster relating to the prepa-

---

**8.** MEEI brought to Dr. Murashige's attention the potential conflict between her representation of MEEI in the '473 application and her representation of QLT on the inventorship issue. *See* Letter from Finn and Glass to Murashige of December 2, 1994 (QLT Opposition Brief at Ex. J; MEEI Reply Brief at Ex. K).

**9.** Some of these categories correspond to QLT's grouping of the withheld communications. QLT redacted this portion of its Opposition Brief when it served MEEI a copy of that brief. Contrary to MEEI's assertion, the redacted portion of QLT's Opposition Brief did not contain *ex parte* argument.

ration and prosecution of the '473 application and the '591 application from March 3, 1994 to September 30, 1998.

In all other respects, I recommend that MEEI's motion be denied.

MEEI and QLT are reminded that any objections to this Report and Recommendation must be filed with the Clerk of the Court within ten days of receipt of the Report and Recommendation and must identify the portion of the Report and Recommendation to which objection is made and the basis for such objection. MEEI and QLT may respond to each other's objections within ten days after service of the objections. MEEI and QLT are further reminded that the failure to file objections within the specified time waives the right to appeal the district court's order.